### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DIANE SALIGA,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CHEMTURA CORPORATION,<br>　　　　Defendant. | No. 12-cv-832 (VAB) |

### AMENDED RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Diane Saliga, brought this action against her former employer, Chemtura Corporation ("Chemtura" or "Defendant"), asserting causes of action for race discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), discrimination on the basis of race, sex, and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), retaliation in violation of Title VII, discrimination on the basis of race, sex, and religion in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a) ("CFEPA"), retaliation in violation of CFEPA, common law intentional infliction of emotional distress, and common law defamation. For the reasons stated below, the motion is **GRANTED**.

### FACTUAL AND PROCEDURAL BACKGROUND

Chemtura Corporation hired Mrs. Saliga on October 18, 2010 as a Senior Auditor in the Internal Audit Department, and terminated her on October 26, 2011. Second Amended Complaint ("Compl.") ¶ 8; Def. Ex. M.  During Saliga's tenure at Chemtura, the Internal Audit Department consisted of four or five employees.  *See* Saliga Dep. 24-27; Mosher Dep. 172.  At first, Saliga directly reported to Denise Mosher, Chemtura's former Director, Internal Audit.

Saliga Dep. 25.  Mosher left the company on April 12, 2011, and was replaced by Ayesha Jagtiani.  *See* Mosher Dep. 169; Khilnani Dep. 268; Saliga Dep. 25.  In addition, Saliga reported to Jogita Khilnani, Chemtura's former Vice President, Internal Audit, who was also involved in both the decision to hire her and the decision to terminate her.  Saliga Dep. 25, 88, 173-74, 269; Def. Ex. P; Peterson Dep. 41; Khilnani Dep. 82-89, 265-68.  Prior to joining Chemtura, Saliga had worked at Hubbell Incorporated; Mosher and Khilnani were also employed by Hubbell Incorporated at that time.  Saliga Dep. 117-19; Khilnani Dep. 80-81, 85-87.

A few days after Saliga was hired, Khilnani allegedly said in Saliga's presence, "Who would want to stick anything in that big fat hole, and what good would come out of it?" about Chistine Peterson, Chemtura's former Human Resources Generalist.  Saliga interpreted that comment as Khilnani "hitting on me."  Saliga Dep. 91.

During Saliga's time at Chemtura, Khilnani is alleged to have called her "whitey a couple times [*sic*]."  Saliga Dep. 533.  Khilnani also allegedly referred to another employee as "the cute white boy."  Saiga Dep. 533-34.  At some unspecified times, Khilnani and Jagtiani allegedly complained to Mosher about Saliga engaging in religious reading at work.  Mosher Dep. 52-53.

In early 2011, Saliga requested a promotion to Lead Auditor, but was denied.  Saliga Dep. 217.  Also in early 2011, according to Saliga, Khilnani was selecting people to travel to conduct planning audits, which Saliga expressed interest in doing; Khilnani allegedly told her that she would not be selected because the audits included weekend work and Khilnani was worried about Saliga having to go to church.  When Saliga complained that she would not let her religion stop her from doing her work, Khilnani allegedly would still not send her.  Saliga Dep. 28-29.

Saliga further alleges that, in early 2011, Khilnani told her that she had only stayed married to her husband for so long because of her religion.  Saliga Dep. 38.  Saliga testified that she recalled telling Peterson at some unspecified time that Khilnani "has no right bringing up my husband in the workplace," though she could not remember when she told her about Khilnani's alleged comment.  Saliga Dep. 57-58.

Although the schedule of critical deliverables had been published and agreed to at the beginning of the year, Saliga missed a number of deadlines from mid-April through May 2011, and failed to complete various tasks in a timely manner.  *See* Exs. B, C.

In or around May 2011, Khilnani allegedly loudly reprimanded Saliga for saying, "God bless you," after somebody in the office sneezed, and told Saliga not to "bring God into this place again."  Saliga allegedly was reprimanded by Khilnani once again shortly thereafter for saying, "Bless you," after another sneeze.  Saliga Dep. 36-41.  Saliga alleges that she "probably said something" at the time to Khilnani to complain about this incident.  Saliga Dep. 538.  In addition, at some unspecified time, Saliga allegedly complained to Peterson that Khilnani had been offended by her saying those words.  Peterson Dep. 85.

On an unspecified summer day in 2011, Saliga wore a "chi rho" religious charm to work, and Khilnani allegedly said, "Why can't you wear a simple cross like normal people wear?" and "it's disgusting."  Saliga Dep. 39.

On June 2, 2011, Khilnani sent an email to Mosher stating, "Diane is not someone you should trust and I tell you that because she is and has been two faced with you."  Def. Ex. Q.

On July 28, 2011, after Saliga had been at Chemtura for about nine months, she was given a mid-year review.  Def. Ex. B.  Jagtiani and Khilnani noted many performance, communication, and interpersonal issues that needed to be addressed and improved, specifically:

missed deadlines; trouble working independently on assignments without detailed direction and micro-management; time management skills; need to contribute to writing the audit report and recommendations and not just reviewing it after the fact; working collaboratively with team members without passing derogatory comments. Saliga asserts that her missing five deadlines from April through August was caused by other employees' failures. *See*, *e.g.*, Saliga Dep. 556; Pl. Ex. 17.

During a meeting in Khilnani's office on July 28, 2011, following the mid-year review, Saliga yelled at Khilnani. *See* Pl. Exs. E, F. She allegedly said that she did not give a shit about the review. Def. Ex. E. She allegedly attempted to blame her performance deficiencies, falsely, on a co-worker. Def. Exs. E, G. In addition, at some point on July 28, 2011, Khilnani was meeting privately with Saliga to discuss the need for Saliga to stop being insensitive to other cultures and religions, and during the meeting, Khilnani referenced the fact that Saliga is "Caucasian," which upset and offended Saliga greatly. Saliga testified, "Thank goodness I didn't get into an accident" driving home that night because "I was upset" that Khilnani was "calling me the 'C' word." Saliga Dep. 105-06.

On August 1, 2011, Peterson met with Khilnani and Mohsen Baccar—who, like Saliga, was a Senior Auditor, Internal Audit—to discuss his concerns about working with Saliga, as she allegedly made him feel uncomfortable by making comments on his ethnicity and questioning his ethics. Def. Ex. G.

Khilnani gave Saliga a written reprimand on August 4, 2011, noting her unsatisfactory job performance, for which she would be placed on a Performance Improvement Plan ("PIP"), and her "unacceptable" behavior as a member of the Audit team, which would subject her to discipline, up to and including termination, if such conduct did not stop immediately. Def. Ex.

H.  The written reprimand clearly stated that Saliga was "hereby notified that unless immediate, sustained improvement is demonstrated to bring [her] performance up to a satisfactory level, [she] will be subject to additional discipline, up to and including termination of [her] employment with Chemtura."  *Id.*  It also stated that if Saliga's "extremely unprofessional" conduct toward her co-workers "does not stop immediately, . . . [she] will be subject to discipline, up to and including termination of [her] employment with Chemtura."  *Id.*  At the reprimand meeting with Saliga on August 4, 2011, Saliga alleges that she brought up the "God bless you" comments.  Peterson met with Baccar later that day, and he expressed concern that Chemtura had not addressed the issue of Saliga's allegedly slandering him concerning his work and his ethics.  Def. Ex. J.

The PIP, which Saliga also received on August 4, 2011, set forth improvement goals and action steps, with target dates, and her progress was reviewed with her at meetings on an ongoing basis until her termination.  Def. Ex. I.  From the outset, the PIP set forth to Saliga the following information:

> If you do not show improved and sustained results within the specified time period, or you fail to maintain this level of performance going forward, your poor performance may result in further action including immediate termination of your employment.
>
> Chemtura is an at-will employer and, as such, you will remain an at-will employee . . . .  As such, your employment may be terminated by you or by Chemtura at any time, with or without cause, and with or without advance notice."  Five meetings were held over the nearly three-month course of the PIP.

*Id.*  At the first PIP meeting, held on August 25, 2011, it was noted that a review she had been responsible for conducting was "not completed to expectations," and would have to be re-done. *Id.*  It was noted that Saliga had made some progress, but still needed to step up to show additional improvement.  *Id.*

5

At an unspecified time, Human Resources allegedly advised Khilnani that it is inappropriate to make comments around Saliga's religion.  Peterson Dep. 87.  Saliga informed Peterson of Khilnani's alleged comment about Peterson's "fat hole" on August 26, 2011.  Pl. Ex. 25.  There is no record evidence of any investigation by Chemtura into the "fat hole" comment. *See*, *e.g.*, Peterson Dep. 59.

On August 31, 2011, Khilnani allegedly put her hand on Saliga's left cheek and kissed her on the cheek "in a very romantic way."  Saliga Dep. 328.  Saliga testified that she "felt raped and violated."  *Id.*at 327.  Saliga informed Peterson on September 1, 2011 that "[t]he hug and kiss from Jogita at the end of our discussion does give me chills though."  Pl. Ex. 27.

The second PIP meeting occurred one week after the first, on September 1, 2011, and Khilnani noted "significant progress in areas outlined" by the PIP, and acknowledged this to Saliga; the PIP form notes, "Overall moving in positive direction per Jogita [Khilnani] and Ayesha [Jagtiani]."  Def. Ex. I.

In or around early September 2011, after Hurricane Irene had knocked out electricity, Khilnani allegedly made a comment to Saliga that Khilnani had gone to the store and it only had "Jesus candles" left in stock.  Saliga Dep. 101-04.  Saliga testified that this offended her.  *See id.*

In mid-September, an email exchange between Saliga and Khilnani highlighted some deficiencies in Saliga's recent work product, as well as issues with her interpersonal working relationships.  Def. Ex. N.  Khilnani offered to further explain her guidance to Saliga in person when Saliga returned from her vacation.  *Id.*

At the third PIP meeting, which occurred on October 7, 2011, it was noted that Saliga's "[q]uality of work [is] a concern," and identified issues with two specific projects.  As a result, it was noted that the PIP meetings "will occur weekly moving forward.  Def. Ex. I.  Saliga later

noted to Peterson that Khilnani "got me on quality which is what is expected."  Pl. Ex. 32.  After

the PIP meeting ended, Khilnani allegedly "put her arm around" Saliga while walking back

down the hall.  Saliga Dep. 81-86, 567-68.  Saliga informed Peterson of this incident in an

electronic conversation later that day.  Pl. Ex. 33 ("[S]he actually put her arm around me while

walking down the hall on the way back[.]  Who does she think she is[?]").  Saliga testified that

Khilnani "was probably telling me something," but "I have no idea what she was telling me."

Saliga Dep. 83.  She further testified that Khilnani "might have said something to me.  Did I

respond to her?  Whatever!  I said: Whatever!  And I threw her arm off."  Saliga Dep. 84.  Saliga

testified that she felt the gesture was "condescending."  Saliga Dep. 372.

Saliga sent an email to Susan Mullen, Chemtura's former Human Resources Director,

and Peterson on October 9, 2011, complaining about the following inconsistent treatment from

her supervisors: (1) being placed on the PIP on August 4; (2) the August 31 "hug and kiss in

[Khilnani's] office; (3) the September 1 PIP meeting "where everything is nice"; and (4) the

October 7 PIP meeting "which conveyed a lot of animosity," and after which Khilnani "puts her

arm around me on my shoulder and said whatever."

No improvement was noted at the final two PIP meetings, which occurred on October 12

and 19, 2011.  Def. Ex. I.  Baccar met with Peterson and Saliga on October 17, 2011, to express

his continued frustrations in working with Saliga.  Def. Ex. L.  Saliga's alleged mistreatment of

Baccar allegedly prompted him to consider resigning.  *See* Def. Ex. L; 56(a)(1) Stmt. ¶ 26;

56(a)(2) Stmt. ¶ 26.

As described above, Saliga made some improvements during the PIP process, but overall,

her performance allegedly was not meeting expectations and she was terminated on October 26,

2011.  *See* Def. Exs. I, M.  On January 12, 2012, Saliga sent an email to Khilnani and Mullen,

asking for her job back.  Def. Ex. P.  Saliga filed a complaint with the EEOC and CHRO on

February 10, 2012.  Compl. ¶ 5.

## DISCUSSION

**I.      Statutory Claims**

**A.      Disparate Treatment**

Saliga asserts claims for disparate treatment based on her race and religion[1] under Section

1981, Title VII, and CFEPA.  The legal standard for finding disparate treatment liability under

all three statutes is the same: a plaintiff's claims are subject to the three-step, burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See also Martin v.*

*Citibank, N.A.*, 762 F.2d 212, 216-17 (2d Cir. 1983) (applying same standard to Section 1981

and Title VII claims); *White v. Conn. Dep't of Children and Families*, 330 F. App'x 7, 9 (2d Cir.

2009) (Title VII and CFEPA claims both employ same burden-shifting analysis).

To overcome a motion for summary judgment under the *McDonnell Douglas* burden-

shifting framework, "a plaintiff must first satisfy an initial burden of 'proving by the

preponderance of the evidence a prima facie case of discrimination.'"  *Robinson v. Concentra*

*Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015).  Establishment of the prima facie case creates

a presumption that the employer unlawfully discriminated against the employee, thus placing

upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*,

the burden of 'producing evidence' that the adverse employment actions were taken 'for a

legitimate, nondiscriminatory reason.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07

(1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  "It is

---

[1] Although not entirely clear on this point, Saliga appears also to assert in her filings a claim for disparate treatment on the basis of sex.  However, the Court cannot find any briefing or record evidence to support such a claim, and counsel for Saliga stated during oral argument on this motion that the sex discrimination claim is based solely on a theory of sexual harassment.

important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 450 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253).

> If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and drops from the case. The plaintiff then has the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that [protected class] was. He retains that ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination.

*St. Mary's Honor Ctr.*, 509 U.S. at 507-08 (internal quotation marks and citations omitted). The plaintiff's "burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256 (1981). She may succeed by showing "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

### 1.    Disparate Treatment on the Basis of Race

#### a.    Prima Facie Case

To satisfy the prima facie burden in a case of unlawful discrimination, the plaintiff must show: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). As the Second Circuit has noted, "the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is '*de minimis*.'" *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). However, while Saliga's burden to establish a prima facie case of discrimination is minimal, she

"cannot meet this burden through reliance on unsupported assertions." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Saliga's racial discrimination claim fails because she has failed to meet even her *de minimis* burden with respect to the second and fourth prongs of the prima facie case.

### i.      Protected Class

Saliga satisfies her *de minimis* burden of showing she belongs to a protected class. It is undisputed that she is white.

### ii.      Qualified for the Position

Although an employee need not show "even average performance" to satisfy the second prong of the prima facie case, *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir. 1978), "[i]n a discharge case the requirement that the plaintiff be qualified for the job in question requires some allegations demonstrating satisfactory performance at the time of the discharge," *Dugan v. Martin Marietta Aerospace*, 760 F.2d 397, 400 (2d Cir. 1985). "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). The rationale behind this criteria is that the employee must demonstrate that "his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him." *Powell*, 580 F.2d at 1155 (2d Cir. 1978) (internal quotation marks and citation omitted).

Here, Saliga was employed for a short period of time before being placed on a PIP for performance deficiencies. After nine months at Chemtura, Saliga was given a mid-year review on July 28, 2011. The review noted many performance, communication, and interpersonal issues that needed improvement. Six days later, Saliga was placed on a written PIP, which addressed

multiple performance and behavioral issues, set forth improvement objectives, action steps, and required results, and provided target dates for completing the action steps and required results. The PIP explicitly stated that, if Saliga did not show improved and sustained results within the specified time period, or failed to maintain that level of performance going forward, termination could result. Even prior to the mid-year review, Chemtura had expressed to Saliga its concern with her missing deadlines and her ability to handle her job responsibilities. *See* Def. Ex. D. During the PIP process, Saliga made some progress but Chemtura determined that she should be terminated for her ongoing poor performance. *See* Def. Exs. I, M.

Saliga argues that she was improving on the PIP, and that she therefore demonstrated satisfactory job performance. The improvement reflected in the record, however, is insufficient to create a triable issue of fact precluding summary judgment. The evidence reflects that there was one week during the nearly three-month PIP that Saliga performed well, meeting Chemtura's expectations. Saliga's subjective perception of her performance is irrelevant; "the ultimate inquiry is whether [the employee's] performance meets his employer's legitimate expectations." *Harvey v. Mark*, 352 F. Supp. 2d 285, 289 (D. Conn. 2005) (quoting *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)) (internal quotation marks omitted).

Based on the record evidence, no reasonable jury could infer that Saliga's job performance was satisfactory at the time of her discharge, and thus the Court must find that she has failed to establish a prima facie case of discrimination on that basis. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134-37 (2d Cir. 1997) (affirming summary judgment where plaintiff had failed to establish satisfactory job performance prong of prima facie case).

### iii.     Adverse Employment Actions

A plaintiff endures an adverse employment action when she experiences "a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)).  Though economic loss is not prerequisite to a finding of material adversity, "there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges of employment.'"  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)).  "An adverse employment action is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (internal quotation marks and citation omitted).  In this case, Saliga alleges seven adverse employment actions: hostile work environment, failure to promote, failure to transfer, defamation, negative reviews, termination, and failure to reinstate.

Saliga's termination, and her negative evaluations directly leading to her termination, constitute adverse employment actions sufficient to support a prima facie case of disparate treatment discrimination.  *See Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("Examples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less important title, a loss of important benefits, or significantly reduced responsibilities."); *Siddiqi v. New York City Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action.").  However, the Court finds that the remaining actions do not.

### (A)     Failure to Promote

In order to state a failure to promote claim, a plaintiff must show that she applied for a position and was rejected.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226-27 (2d Cir. 2004) ("A specific application is required to ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.") (internal quotation marks and citation omitted).  Merely expressing an interest in a position is insufficient to support a failure to promote claim.  *Id.* at 227 (holding "evidence that a plaintiff generally requested promotion consideration" insufficient to state a claim for discriminatory failure to promote).

In this case, according to Saliga, after working for a few months at Chemtura, she expressed interest to Khilnani in a promotion to the internal audit lead position that had opened; Khilnani allegedly laughed at her in response, and Saliga testified that she did not apply for the position as a result.  Saliga Dep. 216-18.  Because Saliga has not established that she applied for and was denied the position, she cannot show that she suffered a material adverse employment action when she was not promoted to the position.

### (B)     Failure to Transfer

Saliga argues that her inability to transfer to another department within Chemtura while she was on the PIP is an adverse employment action.  The Court cannot find it to be an adverse employment action because there is no record evidence that she ever requested a transfer while on the PIP.  Without having requested a transfer while on the PIP and been denied her request, Saliga's claim has no merit.  *Cf. Beyer v. Cnty. of Nassau*, 524 F.3d 160, 166 (2d Cir. 2008) (holding that "employee has established the 'adverse employment action' necessary to make out a prima facie case when she has proffered evidence from which a reasonable trier of fact could

conclude that the transfer sought and denied would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment."); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (noting that plaintiff "must establish that [defendant's] *denial* of her request for a transfer created a materially significant disadvantage in her working conditions").

### (C)      Failure to Reinstate

Failure to rehire may constitute an adverse employment action.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 799-800 (1973) (reversing dismissal of former employee's claim of racial discrimination in failing to re-employ and remanding for trial).  However, once again, there is no record evidence that Saliga applied for and was denied any open positions at Chemtura.  The record merely reflects that she sent correspondence to Khilnani in January 2012, stating "I was wondering if you would consider hiring me back at Chemtura as Senior Auditor with the same annual base salary of $80,000."  Pl. Ex. 39.

### (D)      Defamation

There is no case law standing for the proposition that defamation constitutes an adverse employment action.  In this case, the alleged defamation certainly cannot be said to have caused a materially adverse change in the terms and conditions of Saliga's employment.  Moreover, as discussed *infra*, the record evidence does not support a reasonable inference that Chemtura defamed Saliga.

### (E)      Hostile Work Environment

As discussed *infra*, the record evidence does not support a reasonable inference of a hostile work environment.  Moreover, even if there were a viable hostile work environment claim, in the context of disparate treatment claims, the creation of a hostile work environment

cannot constitute an adverse employment action for purposes of establishing a prima facie case

of discrimination.  *See Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014)

("To state a separate gender discrimination claim, plaintiff must plead 'a separate and distinct

prima facie case,' alleging an adverse action beyond the creation of a hostile work

environment.") (quoting *Bethea v. City of New York*, No. 11-cv-2347, 2014 WL 2616897, at *6,

2014 U.S. Dist. LEXIS 80945, at *17 (E.D.N.Y. June 12, 2014).  Whereas hostile work

environment claims consider the "workplace environment as a whole," disparate treatment

claims require a tangible, "discrete harm[ ] such as hiring or discharge."  *Raniola v. Bratton*, 243

F.3d 610, 617 (2d Cir. 2001).

### iv.    Inference of Discriminatory Intent

In addition to falling short on the second prong, Saliga has failed to establish her prima

facie case of disparate treatment discrimination because she has not alleged sufficient facts to

show that any adverse employment actions she suffered had occurred in circumstances giving

rise to an inference of discrimination on the basis of her race.

### (A)    Stray Comments

Nearly all of Saliga's evidence offered to establish an inference of discriminatory intent

constitute stray remarks, which the Second Circuit has "long held . . . do not create an inference

of discrimination."  *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011);

*see also Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (holding that, without

more, "[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence

to make out a case of employment discrimination").  Essentially, "the more remote and oblique

the remarks are in relation to the employer's adverse action, the less they prove that the action

was motivated by discrimination." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

In determining whether a remark is probative, district courts in this Circuit generally consider four factors: (1) who made the remark (*i.e.*, a decision maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Id.* at 150.  While a number of the comments cited by Saliga were made by Khilnani, who was both a supervisor and decision maker, almost none are alleged to have been made close to the time of any alleged adverse employment decision or to have been related to the decision-making process.

For example, Saliga alleges that Khilnani called her "whitey a couple times," and allegedly referred to another employee as "the cute white boy" on occasion, over the course of their year working together at Chemtura.  Saliga Dep. 533-34.  "Such isolated events over an extended period of time have little intrinsic probative value."  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004).

Saliga also alleges that an unspecified number of individuals at Chemtura made comments that only "foreigners" could work for Internal Audit.  Such comments by non-decision makers, without more, are not evidence that can raise an inference of discrimination and defeat summary judgment.  *Cf. Howard v. City of New York*, 602 F. App'x 545, 547 (2d Cir. 2015); *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-cv-554, 2013 WL 696424, at *6-7, 2013 U.S. Dist. LEXIS 25704, at *19-20 (D. Conn. Feb. 26, 2013); *Campbell v. Alliance Nat. Inc.*,

107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Beyond these non-specific allegations of sporadic comments made at uncertain times, Saliga does allege one specific incident in which she felt disturbed by a comment that she perceived to exhibit racial animus.  During a private meeting between Saliga and Khilnani on July 28, 2011, at which Saliga's alleged insensitivity to other cultures and religions was discussed, Khilnani referenced the fact that Saliga is "Caucasian."  The use of the term "Caucasian" does not carry any associations of racial animus.  *See*, *e.g.*, *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 492 (N.D. Tex. 2010) (using "the term 'Caucasian' to refer to the 2000 U.S. Census category for white persons who are neither Hispanic nor Latino"); *Benton v. Cousins Properties, Inc.*, 230 F. Supp. 2d 1351, 1354 (N.D. Ga. 2002) (using "the terms 'Caucasian' and 'white' . . . interchangeably to refer to individuals whose racial group is white"); *see also* Saliga Dep. 108 (Q. How do you describe yourself racially?  A. When I fill out forms, I'm Caucasian.").  A reasonable juror could not view Khilnani's use of the term "Caucasian" as discriminatory.

Finally, there is testimony that, at some time in 2010, long before Saliga's hiring, Khilnani allegedly told Mosher, "I do not want to hire a black person cause we don't want to travel with them.  They're a different culture."  Mosher Dep. 189.  In addition to being far removed in time from any adverse employment actions taken against Saliga, this comment does not raise an inference that Khilnani was motivated by racial animus against Saliga's protected racial class, *i.e.*, white individuals.

**(B)      Change in Composition of the Department**

In addition to the various stray remarks, Saliga alleges there is an inference of discrimination because, when Khilnani was hired, the majority of the Internal Audit department was comprised of white male employees, but by April 2011, Saliga was the only white employee in the department.  However, nearly all of those employees are alleged to have been let go by Khilnani prior to the hiring of Saliga, who is white, to join the Internal Audit department, a decision made in part by Khilnani.  Therefore, the fact that these other white employees were no longer with the department cannot raise an inference that Saliga's treatment was motivated by discriminatory intent.

**(C)      Same Actor Inference**

Along the same lines, there is a presumption against discriminatory intent in age discrimination cases where the person who fires an employee is the same person that hired him. This is known as the "same actor inference," and while the Second Circuit has not "pass[ed] judgment on the extent to which this inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied," *Feingold v. New York*, 366 F.3d 138, 155 n.15 (2d Cir. 2004), district courts in this Circuit have applied it in both the Section 1981 and Title VII contexts.  *See*, *e.g.*, *Collins v. Connecticut Job Corps*, 684 F. Supp. 2d 232, 250 (D. Conn. 2010); *Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 95 (D. Conn. 2011); *Dellaporte v. City Univ. of New York*, 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014).

As the Second Circuit explained,

The premise underlying this inference is that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee.  Such an inference is strong where the time elapsed between the events of hiring and firing is brief.

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000).  While "the same-actor inference is permissive, not mandatory," *Collins*, 684 F. Supp. 2d at 251, it "applies with greatest force where the act of hiring and firing are not significantly separated in time," *Choate v. Transp. Logistics Corp.*, 234 F. Supp. 2d 125, 130–31 (D. Conn. 2002).  Therefore, the inference is particularly strong here, where Khilnani hired Saliga in October 2010, and fired her one year later in October 2011.  *See Dellaporte*, 998 F. Supp. 2d at 227 (noting that "the presumption against racial bias is difficult to overcome," especially where same individuals hired plaintiff "and fired him less than two years later").

### b.      Legitimate Non-Discriminatory Reason

Chemtura has provided a legitimate non-discriminatory reason for taking the adverse actions of giving Saliga negative evaluations and terminating her.  There is ample, uncontradicted evidence in the record that Saliga missed important deadlines, did not work well with certain colleagues, required a greater degree of direction and supervision than was expected of someone in the position, had trouble understanding instructions, and submitted unsatisfactory work product that occasionally needed to be re-done by others.  *See*, *e.g.*, Def. Exs. B, D, E, H, I, K, N.  About one month before her mid-year review, Saliga herself acknowledged that there were issues with her "teaching style" and not being "as current as [she] should be on [her] SOX" assignment.  Pl. Ex. 17.  Furthermore, Saliga's own PIP notes indicate that she missed numerous target dates and deadlines during the PIP.  Pl. Ex. 22.

### c.      Pretext

Even if she were to have established a prima facie case, Saliga has failed to demonstrate pretext, *i.e.*, that the legitimate, non-discriminatory reasons provided by Chemtura were false and that discrimination was the real reason.  The record provides no basis for creating a genuine issue

of fact as to the falsity of Chemtura's reasons or to race being the real reason for Saliga's negative evaluations and termination.

Saliga argues that the criticisms against her work performance were false, and that she never should have been placed on the PIP in the first place.  Saliga Dep. 558.  However, "[her] view of [her] performance is not at issue; what matters is the perception of the decision maker. The fact that an employee disagrees with an employer's evaluation of [her] does not prove pretext."  *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted), overruled in part on other grounds by *St. Mary's Honor Ctr.*, 509 U.S. 502 (1993); *see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir. 1994) (submission of materials from coworker or supervisor indicating that employee's performance was satisfactory does not create issue of fact where employer was dissatisfied with employee's performance); *Hawkins v. City of New York*, No. 99-cv-11704, 2005 WL 1861855, at *10, 2005 U.S. Dist. LEXIS 15898, at *27 (S.D.N.Y. Aug. 4, 2005) (holding plaintiff's belief that negative performance evaluation was unfounded to be insufficient to meet his burden without some other indicia of discrimination at play).

In addition, Saliga has presented no evidence that she met the deadlines that Chemtura alleges she missed.  Quite the contrary, Saliga admits that she missed those deadlines, but attempts to excuse her failures to meet Chemtura's expectations and to paint those expectations as unreasonable.  Similarly, the primary rebuttal she offers to Chemtura's evidence regarding the unsatisfactory quality of her work product is her testimony that she was held to unreasonable standards.[2]  However, "it is not the function of a fact-finder to second-guess business decisions

---

[2] Saliga also offers Mosher's testimony that during the period Mosher supervised her, which ended April 11, 2011, Mosher gave her positive feedback.  Mosher Dep. 170, 175.  However, Chemtura does not argue that Saliga's performance through April 2011 was a reason for adverse employment actions against Saliga.  As the record reflects, the first missed deadline they recorded was April 18, 2011—a week after Mosher's departure—and the first

or to question a corporation's means to achieve a legitimate goal." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988); *see also Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("The laws prohibiting discrimination in employment were not intended to transform the courts into personnel managers. Federal courts do not have a roving commission to review business judgments, and they must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process.") (internal quotation marks and citations omitted) *aff'd sub nom. Shabat v. Billotti*, 108 F.3d 1370 (2d Cir. 1997).

Saliga similarly has failed to contradict the evidence showing her interpersonal problems at Chemtura. For example, rather than creating a dispute of fact regarding whether she had a problematic working relationship with Baccar at the time Chemtura began taking adverse employment actions against her, she has only introduced evidence showing that she had a good relationship with him prior to that time period, and in fact her testimony is consistent with Chemtura's explanation, confirming that at a certain point, the relationship was "ruined." *See*, *e.g.*, Saliga Dep. 113-15, 534; Mosher Dep. 216; Pl. Ex. 34. Mosher also testified that Saliga was never insubordinate with her while she was Saliga's supervisor. Mosher Dep. 174. However, again, this does nothing to contradict Chemtura's legitimate, non-discriminatory reasons, which involve Saliga's work and conduct post-dating Mosher's tenure there.

In addition to failing to show that Chemtura's non-discriminatory reasons were false, Saliga also fails to provide any evidence to demonstrate that race was the real reason she was negatively evaluated and terminated. Again, all she offers are a few stray comments and her subjective feelings of offense and hurt, which the Court already concluded *supra* were

---

email to Saliga highlighting performance deficiencies is dated June 21, 2011. Def. Exs. C, D. Moreover, Mosher herself testified that even while she was supervising Saliga, Saliga was timely "[f]or the most part," Mosher Dep. 171, and that she never actually conducted an audit with Saliga, Mosher Dep. 179.

insufficient to establish a prima facie case, and are certainly not enough to meet the higher

standard for meeting the plaintiff's burden of persuasion to establish pretext.  *See Hines v.*

*Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 318 (W.D.N.Y. 1999) ("Feelings are not evidence.

Without an objectively reasonable basis for those feelings, they are irrelevant.") (internal

quotation marks and citation omitted); *Thomas v. Saint Francis Hosp. & Med. Ctr.*, 990 F. Supp.

81, 87 (D. Conn. 1998) (holding that to prevail on pretext at summary judgment stage, "plaintiff

must provide more than conclusory allegations of discrimination.").

### 2.      Disparate Treatment on the Basis of Religion

#### a.      Prima Facie Case

##### i.      Protected Class

Saliga satisfies her *de minimis* burden of showing she belongs to a protected class.  It is

undisputed that she is Roman Catholic.

##### ii.      Qualified for the Position

As discussed *supra*, Saliga has failed to satisfy this prong of her prima facie case.

##### iii.      Adverse Employment Actions

As discussed *supra*, Saliga's termination, and her negative evaluations directly leading to

her termination, constitute adverse employment actions sufficient to support a prima facie case of

disparate treatment discrimination.  As discussed *infra*, the additional allegation in the context of

the religious discrimination claim that Khilnani chose not to assign Saliga to audit assignments

requiring travel and weekend work also does not constitute an adverse employment action.

##### iv.      Inference of Discriminatory Intent

In addition to falling short on the second prong, Saliga has failed to establish her prima

facie case of disparate treatment discrimination because she has not alleged sufficient facts to

show that any adverse employment actions she suffered had occurred in circumstances giving rise to an inference of discrimination on the basis of her religion.

### (A)     Stray Comments

With respect to raising an inference that adverse employment actions were taken against Saliga on the basis of her religion, Saliga alleges a number of remarks by her supervisors that purportedly exhibit religious animus.  For example, there is testimony that Khilnani and Jagtiani complained to Mosher about Saliga engaging in religious reading at work.  Mosher Dep. 52-53.  At some point, Khilnani is alleged to have reprimanded Saliga for saying, "God bless you," after somebody sneezed, allegedly telling Saliga not to bring God into the office.  Khilnani also allegedly said to Saliga that Saliga remained married to her husband only because of her relgion.  Khilnani allegedly once used the term "Jesus candles" to refer to religious candles she had seen in a store.  On another occasion, Khilnani allegedly asked Saliga why she wore a particular religious charm instead of a simple cross.  None of these comments are alleged to have occurred in temporal proximity to any adverse employment actions, nor can they be seen as related to the decision-making process.  Therefore, the Court concludes that they are not sufficiently probative of religious discrimination that a jury could reasonably find that Saliga was terminated because of her religion.

Saliga also alleges that she was denied the opportunity to travel for work because Khilnani expressed concern that Saliga would have to go to church, which would potentially interfere with the weekend work that those projects required.  Not being assigned to these projects is not an adverse employment action because there is no evidence that these assignments were materially different in quality than her other assignments or that being assigned to them would have had any material impact on her status or career advancement.  *Cf. Galabya*, 202 F.3d

at 641 (holding that a transfer is an adverse employment action only if it creates a "materially significant disadvantage," *e.g.*, it "was to an assignment that was materially less prestigious, materially less suited to [plaintiff's] skills and expertise, or materially less conducive to career advancement").  Therefore, this comment, too, is neither related nor temporally proximate to an adverse employment action.

### (B)      Same Actor Inference

As discussed *supra*, the same actor inference creates a presumption in this Circuit against finding discriminatory intent.

### b.      Legitimate, Non-Discriminatory Reason

As discussed *supra*, Chemtura has provided a legitimate, non-discriminatory reason for Saliga's negative evaluations and termination, and has thereby satisfied its burden at the second stage of the *McDonnell Douglas* analysis.

### c.      Pretext

Even if she were to have established a prima facie case with respect to religious discrimination, Saliga has once again failed to demonstrate pretext.  As discussed *supra*, there is no genuine issue of fact as to the falsity of Chemtura's reasons for the adverse employment actions suffered by Saliga.  Moreover, there is no genuine issue as to religion being the real reason for these adverse actions having been taken.  *See Meiri*, 759 F.2d at 998 (affirming summary judgment for employer because employee could not establish pretext by alleging that the employer conspired to terminate plaintiff, that the employer misconceived plaintiff's work habits due to the employer's religious discrimination, and that plaintiff heard others make disparaging remarks about plaintiff's religion).

### B.        Hostile Work Environment

Saliga also claims that Khilnani created a hostile work environment in violation of

Section 1981, Title VII, and CFEPA.  To establish a prima facie hostile work environment claim

under Section 1981, Title VII, and CFEPA, "a plaintiff must produce evidence that the

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment."  *Harris v. Forklift Sys.,

Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted); *see also Whidbee v.

Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (holding that "Section 1981

provides a cause of action for race-based employment discrimination based on a hostile work

environment" and applying the same analysis as under Title VII); *Martin v. Town of Westport*,

558 F. Supp. 2d 228, 242 (D. Conn. 2008) ("Connecticut courts look to federal law for guidance

when analyzing CFEPA hostile work environment claims").  "[A] plaintiff must demonstrate

that: (1) she 'subjectively perceive[d] the environment to be abusive;' (2) the conduct was so

'severe or pervasive' that it created an 'objectively hostile or abusive work environment',

meaning 'an environment that a reasonable person would find hostile or abusive'; and (3) the

conduct created an environment abusive to employees 'because of their race, gender, religion or

national origin.'"  *Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 50 (D. Conn.

2011) (quoting *Harris*, 510 U.S. at 21-22).

"In determining whether an actionable hostile work environment claim exists, we look to

all the circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  *Nat'l R.R. Passenger Corp. v.

Morgan*, 536 U.S. 101, 116, (2002).  These factors must be "considered cumulatively in order to

25

obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (internal quotation marks and citations omitted).  Moreover, a single event cannot support a hostile work environment claim unless "extraordinarily severe." *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir. 1995) ("isolated remarks or occasional episodes of harassment will not merit relief" for a hostile work environment claim).

      1.      **Sex**

Saliga's sex-based hostile work environment claim is predicated on the following allegations: Khilnani allegedly said, "Who would want to stick anything in that big fat hole, and what good would come out of it?" in Saliga's presence; Khilnani allegedly hugged Saliga and kissed her on the cheek "in a very romantic way" on August 31, 2011; and Khilnani allegedly put her arm around Saliga's shoulder on October 7, 2011.  These three incidents do not rise to the level of severe or pervasive intimidation, ridicule, and insult.  *See Cook v. New York City Dep't of Educ.*, 90 F. App'x 562, 563 (2d Cir. 2004) (holding that plaintiff whose supervisor attempted to kiss her on the mouth "cannot prevail on a hostile work environment theory" because "[o]nly one overtly sex-based act is alleged here (the kissing incident), and isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness") (internal quotation marks and citation omitted); *Carter v. State of New York*, 151 F. App'x 40, 41 (2d Cir. 2005) ("Three kisses on the cheek in a two-year period, in the absence of any other discriminatory or offensive treatment, do not meet the threshold this Court has established for hostile work environment claims.").

### 2. Race

Saliga's race-based hostile work environment claim is predicated on the following allegations: Khilnani once referred to Saliga as "Caucasian"; Khilnani called Saliga "whitey a couple times" (Saliga Dep. 533); and Khilnani allegedly referred to another employee as "the cute white boy" (Saliga Dep. 533-34). This conduct does not add up to a hostile work environment.

> As the Supreme Court has stated, mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.

*Schwapp*, 118 F.3d at 110-11 (internal quotation marks and citations omitted). As discussed *supra*, the term "Caucasian" is not generally understood to be an epithet. *See* Saliga Dep. 108 (Q. How do you describe yourself racially? A. When I fill out forms, I'm Caucasian."). The remaining comments do not amount to "a steady barrage of opprobrious racial comments."

### 3. Religion

Saliga's religion-based hostile work environment claim is predicated on the following allegations: Khilnani allegedly made derogatory comments to Mosher "once or twice" about Saliga reading religious materials during lunch[3] (Mosher Dep. 52-53); Khilnani allegedly said to Saliga that Saliga only stayed married to her husband because of her religion; Khilnani allegedly once asked Saliga what gives her the right to bring God into every situation and told her not to bring God into the workplace again after she heard Saliga say "God bless you" to someone who

---

[3] Mosher's testimony on this point is contradicted by Saliga's testimony that she never read religious materials at work. Saliga Dep. 39-40.

had sneezed (Saliga Dep. 36); Khilnani allegedly asked Saliga what gives her the right to bless people after Saliga said to someone on another occasion, "Bless you," after that person had sneezed (Saliga Dep. 37); on one occasion, Khilnani allegedly called a chi rho charm Saliga wore around her neck "disgusting" and asked why Saliga did not wear a simple plain cross (Saliga Dep. 39, 59-60); after a hurricane had knocked out the electricity, Khilnani allegedly commented to Saliga that when Khilnani had gone to the store, they were out of all candles except "Jesus candles"; and on more than one occasion, Khilnani allegedly did not assign Saliga to conduct planning audits, which required travel and working through the weekend, because she was concerned about Saliga going to church (Saliga Dep. 28-32).

While these comments may be offensive, they are not severe or pervasive enough for a reasonable juror to infer that they altered the conditions of Saliga's employment.  *See*, *e.g.*, *Brodt v. City of New York*, 4 F. Supp. 3d 562, 571 (S.D.N.Y. 2014) (holding that allegations of a supervisor's comments concerning plaintiff's nine children, supervisor's request that plaintiff pray for him, and supervisor's constant touching and rubbing of plaintiff's yarmulke are "simple teasing, offhand comments, or isolated incidents of offensive conduct that do not give rise to an actionable hostile work environment claim") (internal quotation marks and citation omitted); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 454-55 (S.D.N.Y. 2012) (holding that three incidents over the course of a year in which plaintiff was "chastised" or "berated" in front of his unit regarding his desire to take certain days off as religious observance, before ultimately being given the time off that he requested, at most represent episodic instances of mere offensive utterances"); *Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005) (holding as insufficient to support a hostile work environment claim the fact that chairman of the board's comment to plaintiff that "Orthodox Jews are intolerant and

contemptuous of other Jews" and that during an office holiday party he "was subjected to laughter and ridicule" for stating that the historical figure he would most like to meet is Red Nachman of Breslov.  As discussed *supra*, even Khilnani's alleged failure to assign Saliga to travel for planning audits on the basis of Saliga's religion cannot be found to have interfered with Saliga's work performance, as there is no record evidence that those assignments were materially more prestigious, materially more suited to her skills and expertise, or materially more conducive to career advancement.  *Cf. Galabya*, 202 F.3d at 641.

### C.    Retaliation Claims

Saliga claims that she was terminated in retaliation for complaining about Khilnani's actions, in violation of Section 1981, Title VII, and CFEPA.  Retaliation claims under all three statutes are analyzed under Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework.  *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015); *DeMoss v. Norwalk Bd. of Ed.*, 21 F. Supp. 3d 154, 170 (D. Conn. 2014).  "To establish a presumption of retaliation . . . a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 315-16.  "Even if a plaintiff sets forth a *prima facie* case, however, this establishes only a rebuttable presumption of retaliation, and where the defendant identifies a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for retaliation."  *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x. 107, 110 (2d Cir. 2011) (applying standard to Section 1981 and Title VII claims); *see also Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 341 (D. Conn. Mar. 19, 2013) (applying standard to Section 1981,

Title VII, and CFEPA claims).  "Although the presumption of discrimination drops out of the picture if the Defendant articulates a legitimate, non-discriminatory reason, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual."  *Rivera*, 933 F. Supp. 2d at 341 (internal quotation marks and citations omitted).

With respect to Title VII retaliation claims, "[i]f the defendant satisfies its burden of production" to articulate a legitimate, non-retaliatory reason for the adverse employment action, then "the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's protected activity was a but-for cause of the alleged adverse action by the employer."  *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (internal quotation marks and citations omitted); *see also Univ. Of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (claims of retaliation in violation of Title VII "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").  Prior to *Nassar*, a plaintiff could satisfy the causation requirement at the third stage of the burden-shifting framework by showing that "retaliation was a substantial reason for the adverse employment action."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  Now, the causation standards in Section 1981 and Title VII retaliation claims may differ.  *See Quarless v. Brooklyn Botanic Garden Corp.*, No. 11-cv-05684, 2014 WL 2767085, at *5, 2014 U.S. Dist. LEXIS 83153, at *14 (E.D.N.Y. June 18, 2014).  Likewise, Connecticut courts have not yet adopted the *Nassar* standard of but-for causation for retaliation claims under CFEPA, and thus, CFEPA retaliation claims may also remain subject to the less-demanding "motivating factor" analysis.  *See*

*Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-00357, 2013 WL 5445258, at *21, 2013 U.S. Dist. LEXIS 140983, at *68-69 (D. Conn. Sept. 30, 2013).  However, the distinction does not matter in this case, as Saliga cannot establish a retaliation claim under either standard.

### 1.   Prima Facie Case

Saliga has not established a prima facie case because she cannot show a causal nexus between any possible protected activity in which she engaged and any adverse employment action she suffered.

### a.   Plaintiff's Participation in a Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  Saliga never registered any complaints through the formal channels that were provided at Chemtura. Rather, she communicated various complaints concerning Khilnani's behavior through informal electronic instant messages and verbal conversations with Peterson, as well as some alleged complaints directly to Khilnani.

"While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, the Second Circuit has recognized that protected activity includes informal protests of discriminatory employment practices, including making complaints to management." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110-11 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).  Such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by law; generalized complaints about a supervisor's treatment are insufficient. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011).  Complaints presenting general allegations of harassment unrelated to protected class are not protected activity under Title VII,

Section 1981, or CFEPA.  *See, e.g., Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (holding that complaints about supervisor's treatment, including that supervisor falsely accused plaintiff of sexually harassing a co-worker, could not form basis of retaliation claim), *aff'd*, 629 F.3d 276 (2d Cir. 2010); *Ruhling v. Tribune Co.*, No. 04-cv-2430, 2007 WL 28283, at *21, 2007 U.S. Dist. LEXIS 116, at *67-68 (E.D.N.Y. Jan. 3, 2007) (holding that an internal complaint of favoritism was not protected activity where plaintiff had not framed complaint as involving discriminatory conduct).

The Court finds that the only one of Saliga's alleged actions that constitutes protected activity is her alleged protest to Khilnani in early 2011 concerning work assignments. Specifically, in response to Khilnani's alleged refusal to assign Saliga to audit projects requiring travel and weekend work, Saliga allegedly said, "Do not let my religion stop me from doing my work."  Saliga Dep. 28-29.  This complaint is sufficiently specific to indicate Saliga had a "good faith, reasonable belief," *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996), that she was opposing unlawful religious discrimination.

The remaining activities Saliga alleges are, at best, informal, generalized complaints that do not make it clear she is complaining about discriminatory conduct (1) that was directed at a protected class or (2) that she had a good faith, reasonable belief was prohibited by law. However, even if these other actions were to constitute protected activity, they would still not support a prima facie case because, as discussed *infra*, Saliga cannot establish a causal nexus between any of those actions and her negative evaluations and termination.

### i.        "Fat Hole" Comment

Saliga alleges that, when Khilnani made the "fat hole" comment, Saliga complained to her by shaking her head and walking away.  Saliga Dep. 535-36.  In the Second Circuit, if a

plaintiff's opposition was not understood nor reasonably could have been understood to be directed at conduct prohibited by law, then it does not constitute protected activity. *See Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (plaintiff "did not engage in a protected activity because the letter simply requested additional training and reassignment without ever mentioning, or even alluding to, [plaintiff's] belief that [defendant's] failure to comply with his requests would constitute unlawful discrimination"); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (finding no protected activity where employee's "objections at the time neither pointed out discrimination against particular individuals nor discriminatory practices by" employer); *cf. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp*., 136 F.3d 276, 292 (2d Cir. 1998) (requiring that the employer "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII" to establish a prima facie case of retaliation under Title VII). Saliga's reaction to Khilnani's alleged "fat hole" comment does not support an inference that she was opposing conduct prohibited by Title VII, Section 1981, or CFEPA. Therefore, it does not constitute protected activity.

Saliga also informed Peterson of the "fat hole" comment approximately ten months after it allegedly occurred. Saliga Dep. 560-61. This was in late August 2011, after Saliga had already been placed on the PIP. Peterson interpreted the comment as "directed at my daughter . . . referring to my daughter, me giving birth to my daughter." Peterson Dep. 59. She informed her supervisor, Mullen, about it. Pl. Ex. 25; Peterson Dep. 58-59. Thus, it appears that the target of the alleged comment did not perceive it to be about sex, race, or religion, but rather a general insult about her daughter. Such an insult is not prohibited by law, and therefore, Saliga's conduct in informing Peterson of it is not protected activity. *Cf. Grosdidier v. Chairman, Broad.*

*Bd. of Governors*, 774 F. Supp. 2d 76, 108 (D.D.C. 2011) (finding that two emails plaintiff interpreted as sexually suggestive but were also susceptible to innocent interpretations, along with numerous other alleged incidents, including use of the phrases "Sexy Papa" and "Sexy Mama," to be neither frequent enough nor severe enough to meet the standard for a hostile work environment under Title VII and that therefore plaintiff's complaints about them do not qualify as protected activity for purposes of Title VII's antiretaliation provision).

### ii.    Marriage Comment

Saliga testified that she complained both to Khilnani and to Peterson about Khilnani's remark that Saliga remained married to her husband because of her religion.  She told Khilnani that "I'm very proud to be married to my husband that long; and I am proud to be Catholic," Saliga Dep. 38, and she told Peterson that Khilnani "has no right bringing up my husband in the workplace," Saliga Dep. 57.  These do not constitute protected activity, as there is no indication in these comments that Saliga was opposing prohibited conduct.

### iii.    Admonishment for Blessings

Saliga testified that she "probably said something" to Khilnani after their first alleged "God bless you" interaction.  Saliga Dep. 538.  This is insufficient evidence to show Saliga was engaging in protected activity.  Saliga testified that she also complained to Khilnani after their second "Bless you" interaction, Saliga Dep. 539-40, but there is no evidence of the specific content of this complaint.  Therefore, there is insufficient evidence concerning this complaint to establish that it was protected activity.

Saliga also testified that she reported both of these incidents to Peterson.  Saliga Dep. 540.  Peterson testified, "During one of our conversations, Diane [Saliga] had mentioned that somebody had sneezed and it's customary to say God bless you which Diane did and Jogita took

offense to that." Peterson Dep. 85-87. This evidence does not indicate that Saliga was opposing prohibited conduct.[4] Saliga also allegedly brought up the sneezing incidents again at an August 4 meeting discussing her allegedly poor job performance. Khilnani and Peterson were both in attendance, and Saliga alleges: "I brought up the 'God bless you' comment. I brought up the 'bless you' comment. I brought up the fact that she said the comment about my granddaughter's nose." Saliga Dep. 209. This evidence is insufficient to demonstrate opposition to prohibited conduct, as there was no indication she was pointing out discrimination on the basis of religion, sex, or race.

### iv.       Religious Charm Comment

When Khilnani allegedly insulted Saliga's chi rho charm, Saliga allegedly told Khilnani that she was very proud of it because she purchased it at the Vatican and the Pope blessed it. Saliga Dep. 39, 542. This response does not constitute protected activity. She also told Peterson about Khilnani's comment "just in a passing discussion," Peterson Dep. 81, and Peterson "did not perceive it as a complaint," Peterson Dep. 83. Saliga testified that Peterson responded to this information by stating that she thought Saliga's charm "was pretty" and that she would "wear her cross to work, too." Saliga Dep. 62. This conversation does not constitute protected activity.

### v.       "Caucasian" Reference

Saliga complained about Khilnani's referring to her as Caucasian. As a matter of law, there can be no good faith, reasonable belief that Khilnani's conduct was prohibited discrimination.

---

[4] Peterson testified that she believed Saliga's complaints were protected activity, but a finding of protected activity is a legal conclusion, and therefore this testimony is irrelevant.

### vi.    Physical Contact

After Khilnani allegedly kissed Saliga on August 31, 2011, Saliga does not recall what she did in response.  Saliga Dep. 76, 78.  Thus, there is no evidence that she complained about the incident to Khilnani directly.  Saliga told Peterson about what happened the next day.  Saliga Dep. 79, 255-57; Pl. Ex. 27 ("The hug and kiss from Jogita at the end of our discussion does give me chills though"); Peterson Dep. 47-49.  A reasonable juror could not infer simply from the record evidence of what was communicated that Saliga was pointing out conduct she reasonably and in good faith believed to be unlawful discrimination.

On October 7, Khilnani allegedly touched Khilnani's shoulder, and Saliga reacted by throwing up her left arm to push Khilnani away and saying, "Don't do that to me again."  Saliga Dep. 81.  This comment is not specific enough to constitute protected activity, as it does not clearly indicate Saliga believes she is protesting prohibited discriminatory conduct.

On October 9, Saliga sent an email to Mullen and Peterson stating the following:

- First the PIP starts on 8/4.
- Then on 8/31, Jogita [Khilnani] gives me a hug and kiss in her office.
- We have the PIP meeting of 9/1 where everything is nice.
- Then, we have the PIP meeting on 10/7 which conveyed a lot of animosity.  Also, while walking back to the department after the meeting on 10/7 in the hall, Jogita puts her arm around me on my shoulder and said whatever.  Surprisingly though, it was very visible to anyone that may have been in the hall.

Pl. Ex. 34, at 1.  This communication[5] does not constitute protected activity as it does not clearly indicate that Saliga is protesting conduct prohibited by law; these do not necessarily even appear

---

[5] Placing this excerpt in the context of the entire email does nothing to make it more clearly indicate opposition to prohibited discriminatory conduct.  The subject line of the email is "Meeting of 10/7," and it begins, "Sue and Christine, In summary of our meeting on 10/7, there is an inconsistent reading coming from Jogita and Ayesha." The email then lists the above-quoted bullet points, before continuing, "[Khilnani] and [Jagtiani] are so much in sync.  The two of them are so rehearsed, including the eye rolling.  If I played games, I too would come across differently.  Since I do not rehearse or play games, I am writing this email to give you my side of the situation.  I would not do this, but I am fighting for my job and my integrity.  I believe we all have good qualities and not so good qualities.  When a relationship works well, we tolerate the not so good and communicate with each other.

to be complaints.  There is no indication in this message that Saliga objected to the "hug and kiss," and the statement that Khilnani "puts her arm around me on my shoulder and said whatever" is unambiguously ambiguous.

### b.      Defendant's Knowledge of the Protected Activity

The only complaint that may constitute a protected activity was Saliga's alleged protest that Khilnani not let Saliga's religion stand in the way of Saliga being assigned certain audit projects that required weekend travel.  If true, Khilnani would clearly have been aware of this activity.  Therefore, the second prong is satisfied.

### c.      Adverse Employment Action

As discussed *supra*, the only adverse employment actions suffered by Saliga are her termination and the negative evaluations she received that directly led to her termination.[6]

### d.      Causal Connection

First, the Court notes that counsel for Saliga stated during oral argument on this motion that there was no decision to terminate Saliga's employment during the period of time Saliga made her alleged complaints of discrimination to Peterson, and the record is consistent with that assertion.  This fact, however, would severely undermine the plausibility of a causal link between Saliga's complaints and her termination because, under this scenario, the PIP continued

---

Why this became so out of hand, I do not know but am wondering if I am being made an example of, or I do not fit into the new Internal Audit department, or whatever.  I feel in the past few months, I have gone in so many circles; it is a total waste of my time, company time, and company money."  None of this is specific enough to enable any reasonable factfinder to infer that this email clearly indicates opposition to prohibited discrimination.

[6] It is true that the lower standard for finding an adverse employment action in retaliation claims potentially could impact the analysis on whether the failure to assign Saliga to audit projects requiring travel was such an adverse action.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  However, even if that denial were found to constitute an adverse employment action under *Burlington Northern*, a claim predicated on that denial would fail the fourth prong of the prima facie case because the denial occurred before the Saliga's objection to Khilnani, and in fact was the impetus for her protest.  *See Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.") (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

to proceed after these communications with Peterson occurred, and several more PIP meetings were held at which Saliga's performance was reviewed and she was given feedback before the ultimate decision to terminate was made based on her continued failure to satisfactorily address Chemtura's repeatedly expressed performance concerns.  "In this Circuit, an inference of causation is defeated . . . if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge."  *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).

### i.     Assignment Protest

Saliga's complaints concerning Khilnani's alleged refusal to assign her to projects requiring travel occurred during the first quarter of 2011.  Saliga Dep. 29.  The negative evaluations and termination occurred beginning at the end of July and through late October. Saliga has not alleged a causal nexus between her complaints regarding her lack of assignments requiring travel and her negative reviews and termination.  The only possible nexus the Court can perceive for finding such a nexus is time.

Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), courts in this Circuit "have consistently held that a passage of more than two or three months between the protected activity and the adverse employment action does not allow for an inference of causation," *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007).  In this case, the protected activity took place between January and March.  The negative evaluations leading to Saliga's termination did not come until the end of July, at least four

months after Saliga had complained to Khilnani about not getting the assignments she wanted due to her religion.  Her termination did not occur until three months after that.

The Court concludes that the temporal relationship between Saliga's protected activity and the adverse employment actions she suffered is too attenuated to establish the required causal nexus, and therefore she has failed to establish a prima facie case of retaliation.

### ii.  "Fat Hole" Comment

Even if Saliga's responses to Khilnani's alleged "fat hole" comment could be considered protected activity, Saliga cannot show a causal nexus.  Her immediate reaction upon hearing the comment occurred, according to her testimony, right at the start of her tenure at Chemtura.  Her negative mid-year review came over eight months later.  There is no temporal proximity to establish the fourth prong of the prima facie case with respect to her initial response that was allegedly directed at Khilnani.

With respect to her sharing the comment with Peterson in late August 2011, it is impossible to infer that it caused her negative mid-year review or caused her to be placed on the PIP because those events occurred prior to her action.  It also cannot be said to have caused her further negative evaluations and termination because she received a very favorable evaluation at the next PIP meeting after she told Peterson of the comment.  *Cf. Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (finding no prima facie case because the amount of time between plaintiff's complaint about conduct and negative review, "especially given his intervening positive review, defeats [plaintiff's] attempt to establish a causal connection between the two events").

### iii.      Marriage Comment

Even if Saliga's response to Khilnani's alleged comment regarding Saliga's marriage constitutes a protected activity, Saliga alleges this incident occurred in early 2011, well before any alleged adverse actions occurred.

### iv.      Religious Charm Comment

If Saliga's response to Khilnani's alleged comment about Saliga's chi rho charm were to constitute protected activity, it could support a prima facie case of retaliation, as it allegedly occurred during the summer of 2011, and the negative evaluations and PIP occurred beginning at the end of July through late October.  However, even were a prima facie case to exist with respect to a retaliation claim over Saliga's statement to Khilnani and exchange with Peterson about the charm, Saliga cannot establish that Chemtura's legitimate non-discriminatory reasons, as discussed *infra*, are pretext.

### v.      Physical Contact

Saliga's reactions to the alleged physical contact from Khilnani occurred after Saliga was already on the PIP, so even if her reactions were protected activity, they would not support a prima facie case that her mid-year review or her being placed on the PIP were retaliation because they could not have caused those adverse events.  Were Saliga's responses to the physical contact incidents to constitute protected activity, however, a reasonable inference could be drawn that they caused her later negative PIP evaluations and termination.

### 2.      Legitimate, Non-Discriminatory Reason

As discussed *supra*, Chemtura has amply satisfied its burden of production with respect to the second step of the *McDonnell Douglas* analysis.  Saliga's negative evaluations and termination resulted from Saliga's failure to perform her job satisfactorily.

### 3.     Pretext

To establish pretext, a plaintiff could demonstrate

> weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.   From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason. . . .   Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. . . .   However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013).   "Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact."   *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (affirming summary judgment for employer where employee "produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual").

Here, Saliga only has temporal proximity to support some of her retaliation claims, but nothing more.   It is undisputed that, at the time she began suffering adverse employment actions, she did not meet a number of Chemtura's deadlines, had problematic working relationships with certain coworkers, performed unsatisfactory work that occasionally had to be reassigned, and required a degree of management and direction Chemtura found excessive.   Saliga has not demonstrated any "weaknesses, implausibilities, inconsistencies, or contradictions" in Chemtura's explanations for her negative evaluations and termination; the evidence she offered only goes to show her disagreement with the standards to which she was being held.   *See, e.g.*, *Gehringer v. St. Joseph's/Candler Health Sys., Inc.*, No. 4:12-cv-77, 2013 WL 1180920, at *16, 2013 U.S. Dist. LEXIS 38863, at *45 (S.D. Ga. Mar. 20, 2013) ("[I]t is not the Court's role to question the wisdom of an employer's decision.   Whether [Plaintiff] was a good employee and whether Defendant made a bad decision is irrelevant as long as the termination was not made for

discriminatory reasons.").  Saliga has presented no evidence to rebut or undermine Chemtura's

legitimate, non-discriminatory reasons, and thus has failed to satisfy the third stage of the

*McDonnell Douglas* test, regardless of whether the Court applies a but-for or motivating factor

standard.

## II.     Common Law Claims

Saliga asserts common law claims for intentional infliction of emotional distress and

defamation.  For the reasons stated below, the motion is GRANTED.

### A.     Intentional Infliction of Emotional Distress

Under Connecticut law, four elements must be established to prevail under a claim for

intentional infliction of emotional distress: "(1) that the actor intended to inflict emotional

distress or that he knew or should have known that emotional distress was the likely result of his

conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was

the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff

was severe."  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (Conn. 2000)

(internal quotation marks and citation omitted).

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme

and outrageous is initially a question for the court to determine.  Only where reasonable minds

disagree does it become an issue for the jury."  *Appleton*, 254 Conn. at 210 (citations omitted).

"The general rule is that there is liability for conduct exceeding all bounds usually tolerated by a

decent society, of a nature which is especially calculated to cause, and does cause, mental

distress of a very serious kind."  *Golnik*, 299 F. Supp. 2d at 15 (internal quotation marks and

citations omitted).

'Liability has been found only where the conduct has been so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of

> decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!'"

*Appleton*, 254 Conn. 205, 210-11 (quoting 1 Restatement (Second), Torts § 46, cmt. (d), p. 73 (1965)).  Connecticut courts have been reluctant to allow claims for intentional infliction of emotional distress, even in cases involving significant employment-related activities, and in applying Connecticut law, federal courts in this District have interpreted the extreme and outrageous requirement strictly.  *See Golnick*, 299 F. Supp. 2d at 15-16 (collecting cases); *Lopez-Salerno v. Hartford Fire Ins. Co.*, No. 3:97-cv-273, 1997 WL 766890, at *7, 1997 U.S. Dist. LEXIS 19724, at *19-21 (D. Conn. Dec. 8, 1997) (same).

"There is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action as the court must look to the specific facts and circumstances of each case in making its decisions."  *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001) (internal quotation marks and citation omitted).  However, "[c]ertain principles have emerged in the context of employer/employee relationships which guide the analysis.  A court evaluates whether '. . . the employer's conduct, not the motive behind the conduct, [is] extreme or outrageous.'"  *Armstead v. Stop & Shop Cos., Inc.*, No. 3:01-cv-1489, 2003 WL 1343245, at *5, 2003 U.S. Dist. LEXIS 4107, at *14 (D. Conn. Mar. 17, 2003) (citations omitted) (alterations in original).  Thus, claims of employer misconduct that challenge motive or intent are dismissed unless the manifesting conduct is itself outrageous or extreme.  Furthermore, "[e]ven conduct which is unlawful may not be labeled 'extreme and outrageous' unless it has a natural tendency to have an extraordinarily negative effect upon the emotional well-being of any person who is exposed or subject to it."  *Hamilton v. Town of Hamden*, No.

3:08-cv-164, 2008 WL 4999301, at *10, 2008 U.S. Dist. LEXIS 94242, at *26 (D. Conn. Nov. 19, 2008) (internal quotation marks and citation omitted).

The Court concludes that no reasonable juror could conclude that the conduct alleged in this case can meet the high threshold of extreme and outrageous conduct. The alleged conduct certainly can be seen as offensive and inappropriate, but "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527 (Conn. 2012) (internal quotation marks and citation omitted). The rude comments, the unwanted kiss, and all the other alleged bad acts of Khilnani and others at Chemtura do not satisfy the well-established standard under Connecticut law. *See*, *e.g.*, *Tracy v. New Milford Pub. Schs.*, 101 Conn. App. 560, 567-70 (Conn. App. Ct. 2007) (conduct not outrageous where supervisor conspired with superintendent in pattern of harassment including denial of position, initiating disciplinary actions without proper investigation, defamation of character, and intimidation); *Armstrong v. Chrysler Fin. Corp.*, No. 3:97-cv-1557, 1998 WL 342045, at *5, 1998 U.S. Dist. LEXIS 9357, at *16 (D. Conn. May 14, 1998) (conduct by supervisor who "criticized, insulted, demeaned, and embarrassed [plaintiff] on a daily basis, took away her authority, frequently declared her incompetent, and demeaned her professional ability in the presence of her superiors and subordinates . . . does not meet the required threshold of outrageousness"); *Valencia v. St. Francis Hosp. & Medical Ctr.*, 1996 WL 218760, at *8, 1996 Conn. Super. LEXIS 894, at *23 (Conn. Super. Ct. Apr. 2, 1996) ("allegations that [supervisor] 'grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her' . . . is insufficient to support" intentional infliction of emotional distress claim); *Lorenzi v. Connecticut Judicial Branch*, 620 F. Supp. 2d 348, 353 (D. Conn. 2009)

("Close supervision, the demeaning and unprofessional speech alleged by the plaintiff, unfair job appraisals, inferior office space, denial of pay raises and promotions, orders to limit interactions with certain other employees, insults about one's lunch, discrimination on the basis of race and/or national origin, and/or retaliating against an employee for complaining about such discrimination, do not meet the standard for finding that conduct was extreme and outrageous.").

Against this framework, Saliga must also attribute the alleged abuses of Khilnani to the defendant, Chemtura, in order for her intentional infliction of emotional distress claim to survive. However, "a company is not liable for the intentional torts of its employees that are engaged in outside the scope of their employment." *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 331 (D. Conn. 2014). Therefore, even if any of Khilnani's alleged conduct did meet the extreme and outrageous standard, the Court concludes that such conduct could not be imputed to Chemtura.

To evaluate the degree to which an employee was acting within the scope of her employment, "courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Nathans v. Offerman*, 922 F. Supp. 2d 271, 275 (D. Conn. 2013) (internal quotation marks and citations omitted). "An employer is not liable for an employee's unforeseeable and misguided attempt to serve his employer." *Marini*, 64 F. Supp. 3d at 331-32. Although it is undisputed that Khilnani's conduct occurred during business hours, conduct of the type Saliga alleges was not part of Khilnani's job description and indeed Saliga argues that much of it was expressly prohibited by company policy.

Therefore, summary judgment must be granted as to Saliga's intentional infliction of emotional distress claims.

**B.     Defamation**

"Under Connecticut law, to establish a prima facie case of defamation a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 364 (D. Conn. 2014) (internal quotation marks and citation omitted); *see also Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (Conn. 2009).  Saliga's defamation claim fails, however, because the allegedly defamatory statements cannot be attributed to Chemtura.

Once again, the Court notes, as discussed *supra*, "a company is not liable for the intentional torts of its employees that are engaged in outside the scope of their employment." *Marini*, 64 F. Supp. 3d at 331 (D. Conn. 2014).  Therefore, even if Khilnani's statement in an email message to Mosher that she should not trust Saliga because Saliga had been two-faced with her did constitute a defamatory statement, Chemtura could not be held responsible for it. As already explained, to evaluate the degree to which an employee was acting within the scope of her employment, courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer.  An employer is not liable for an employee's unforeseeable and misguided attempt to serve his employer." *Id.* at 331-32.

The email message was sent after business hours.  *See* Pl. Ex. 14, at 1.  The email

discusses personal matters, such as family and relationship issues, and contains no work-related

content.  Finally, it cannot be inferred from any of the record evidence that the email message, or

the allegedly defamatory statement therein, was motivated in any way by a purpose to serve the

employer.  Even Saliga's counsel asserted at oral argument on this motion that the statement

served no legitimate business purpose.  Therefore, the allegedly defamatory statement cannot be

imputed to Chemtura and Saliga's defamation claim must fail.[7]

### CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Doc. No.

162] is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant and to close

this case.


SO ORDERED at Bridgeport, Connecticut, this 1st day of October, 2015.



   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[7] Saliga testified that Mosher told her that Khilnani also made the same statement orally at the workplace on more than one occasion.  Saliga Dep. 286, 288-89.  This is inadmissible hearsay, which is generally "an insufficient basis for opposing a motion for summary judgment."  *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).  There is no record evidence from anyone who directly witnessed Khilnani making such statements orally at the office, including a notable absence of any such assertion in the excerpts of Mosher's deposition that have been submitted to the Court.  Without any admissible evidence to support the assertion that Khilnani made this allegedly defamatory statement orally in the presence of other Chemtura employees at the workplace, the Court will not consider the allegation in deciding on the present motion for summary judgment.  *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.") (internal quotation marks and citations omitted).